# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CC-01472-SCT

*SIERRA CLUB, EVERETT KENNARD AND*
*BOSWELL KENNARD*

*v.*

*MISSISSIPPI ENVIRONMENTAL QUALITY*
*PERMIT BOARD AND WILLIE (BILL) CARROLL*
*COOK d/b/a COOK SWINE FARM*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2005 |
| TRIAL JUDGE: | HON. ROBERT L. LANCASTER |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | ROBERT B. WIYGUL |
| ATTORNEYS FOR APPELLEES: | RICKY L. BOGGAN |
| | JAMES T. McCAFFERTY |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 11/30/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., GRAVES AND DICKINSON, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. In this administrative dispute, the Mississippi Environmental Quality Permit Board ("Permit Board") issued an air pollution control permit to the owner and operator of a swine concentrated animal feeding operation ("CAFO"). Several neighbors appealed the Permit Board's decision. Finding that the agency's decision to issue the permit was supported by substantial evidence, we must affirm.

## BACKGROUND FACTS AND PROCEEDINGS

¶2. Bill Cook is the owner and operator of a CAFO in Oktibbeha County, Mississippi. The facility includes eight barns housing up to 7,040 swine as they are being grown from approximately forty to fifty pounds each to approximately 250 pounds each. The barns have slatted floors to allow the manure to drop into a holding area, and a collection system flushes the waste into an anaerobic lake. The liquid is later drawn from the top of the lake and sprayed as fertilizer on fields. There is no dispute that Cook's facility meets the exacting federal and state requirements for CAFOs with respect to the control of water pollution. This case revolves around the sole issue of the facility's satisfaction of state air quality standards.

¶3. When Cook's facility began operations in 1996, the Permit Board did not require air pollution permits for swine CAFOs. As such, the Permit Board only issued a National Pollutant Discharge Elimination System ("NPDES") permit to Cook. That decision was appealed to the Chancery Court of Oktibbeha County by Everett Kennard and others, and the chancellor held the CAFO was required to obtain an air permit. The Permit Board and Cook then appealed the decision to this Court.

¶4. While the matter was on appeal, the Mississippi Legislature amended Miss. Code Ann. Section 49-17-29 (Rev. 2002) to allow the Mississippi Environmental Quality Commission ("Commission") to establish categories of sources not required to obtain an air permit and to allow for the issuance of multimedia permits, that is, permits combining both water pollution and air pollution control standards. Because the resulting regulatory amendment by the Commission did not exempt CAFOs, the parties agreed Cook would submit an application for an air permit.

2

¶5. On December 13, 1999, Cook submitted his application. The Mississippi Department of Environmental Quality ("MDEQ"), acting as technical staff for the Permit Board, created a draft permit and published a public notice on October 18, 2000, inviting public comment on the draft permit. After receiving many comments, MDEQ conducted a public hearing on May 31, 2001. On March 12, 2002, MDEQ recommended to the Permit Board that an air pollution control chapter be added to Cook's existing NPDES permit, thus transforming it into a multimedia permit.[1] These controls included the construction of a windbreak wall behind the exhaust fans of each housing unit based on MDEQ staff determinations that the exhaust fans were the primary source of off-site odor transfer. After further review, the Permit Board accepted MDEQ's recommendation and issued the multimedia permit to Cook.

¶6. The objectors to the permit (the Mississippi Chapter of the Sierra Club, Everett Kennard, and Boswell Kennard [hereinafter "Kennard"]), as well as Cook, requested an evidentiary hearing before the Permit Board regarding the multimedia permit. The Permit Board required all parties to file written direct and rebuttal testimony from witnesses prior to the hearing. In general, Kennard argued the permit required too little of Cook and was thus an arbitrary and capricious action, while Cook argued the permit required too much and was thus an action beyond the authority of the Permit Board.

¶7. On September 10, 2002, the Permit Board conducted an evidentiary hearing on Cook's multimedia permit. The testimony of multiple lay witnesses and experts was presented by the parties and considered by the Permit Board. At the conclusion of the hearing, the Permit

---

[1] See the appendix for a list of the control features added to Cook's NPDES permit in the new air requirements chapter.

Board deliberated and then voted to affirm its previous issuance of the Cook facility multimedia permit as written.

¶8. Kennard again appealed the Permit Board's decision to the Chancery Court of Oktibbeha County, and Cook cross-appealed. On August 25, 2003, the chancellor denied both the appeal and cross-appeal, finding that

> [t]he Permit Board has determined that the air pollution control conditions of the permit are necessary to operated the CAFO in compliance with the ambient air quality regulation. That decision is supported by substantial evidence, is not arbitrary or capricious, is within the power of the Permit Board to make and does not violate any statutory or constitutional right of Cook. The Permit Board has determined that additional air pollution control conditions are not necessary to operate the CAFO in compliance with the ambient air quality regulation. That decision is also supported by substantial evidence, is not arbitrary or capricious, is within the power of the Permit Board to make and does not violate a statutory or constitutional right of the Objectors.

The chancellor also noted that "[a]n administrative appeal is not a means to have a court re-weigh evidence and reach a different conclusion." The chancellor found the Permit Board's decision was supported by substantial evidence, was not arbitrary or capricious, was within the Permit Board's power, and did not violate any party's rights. Therefore, the chancellor affirmed the Permit Board's decision.

¶9. Aggrieved, Kennard filed this appeal, raising three issues for our review: (1) whether the Permit Board's interpretation of Mississippi Air Quality Standard APC-S-4 was unreasonable and contrary to the regulation's plain language; (2) whether the Permit Board provided sufficient findings of fact and conclusions of law with respect to the technical and expert evidence presented to it; and (3) whether the Permit Board's decision not to require a

4

monitoring regime for Cook's facility was arbitrary and capricious. We find no merit in Kennard's assignments of error and affirm the chancellor's judgment.

## DISCUSSION

¶10. We review this matter under the same standard recognized by the chancellor in his review of the administrative order issued by the Permit Board. Understanding he was not sitting as a fact-finder in a nuisance trial, but rather was acting as an appellate court reviewing a decision of an administrative agency, the learned chancellor articulated the correct standard as follows:

> An administrative appeal is not a means to have a court re-weigh evidence and reach a different conclusion. And a permit from an administrative agency is not an authorization to operate a nuisance. A court performs two different functions when determining whether to enjoin a permitted operation as a nuisance and when determining to reverse or affirm an administrative decision. The court must respect that difference. An equity suit is fact driven. An administrative appeal is law driven. Both proceedings are ultimately public policy driven. And public policy is uniquely fitted for the legislature. The legislature has delegated the permitting decision to the Permit Board.

By statutory mandate, "[a]ppeals shall be considered only upon the record as made before the Permit Board." Miss. Code Ann. § 49-17-29(5)(b) (Rev. 2002). *See also* ***Golden Triangle Reg'l Solid Waste Mgmt. Auth. v. Concerned Citizens Against the Location of the Landfill***, 722 So. 2d 648, 652 (Miss. 1998). This Court has previously held:

> Matters of law will be reviewed de novo, with great deference afforded an administrative agency's construction of its own rules and regulations and the statutes under which it operates. Therefore, an agency's decision will not be disturbed on appeal absent a finding that it (1) was not supported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party.

*McDerment v. Miss. Real Estate Comm'n*, 748 So. 2d 114, 118 (Miss. 1999) (internal citations omitted).

¶11.   Substantial evidence is "something less than a preponderance of the evidence but more than a scintilla or glimmer. The reviewing court is concerned only with the reasonableness of the administrative order, not its correctness." *Miss. Dep't of Envtl. Quality v. Weems*, 653 So. 2d 266, 280-81 (Miss. 1995) (internal citations omitted). An action "is arbitrary or capricious if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 281 (internal citations omitted). A rebuttable presumption exists in favor of agency decisions, and this Court may not substitute its own judgment for that of the agency. *Miss. Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors*, 621 So. 2d 1211, 1216 (Miss. 1993).

¶12.   Against this background of authority and precedent establishing our standard of review, we now proceed to review the Permit Board's decision.

> **I.     Whether the Permit Board's interpretation of Mississippi Air Quality Standard APC-S-4 was unreasonable and contrary to the regulation's plain language.**

¶13.   Kennard takes issue with the Permit Board's interpretation of Mississippi Air Quality Standard APC-S-4, arguing the Permit Board erroneously focused on a single factor and ignored the factors favorable to the objectors. This led to an unreasonable interpretation of the regulation at odds with its plain and unambiguous language. Therefore, Kennard argues the

6

Permit Board's decision should be reversed and the matter remanded with instructions as to the regulation's proper interpretation.

*Mississippi Air Quality Standard APC-S-4*

¶14. This Court's only precedent addressing state regulation of odor is ***Mississippi Air & Water Pollution Control Permit Board v. Pets & Such Foods, Inc.***, 394 So. 2d 1353, 1355 (Miss. 1981), where this Court reversed the agency's decision because the regulation in effect at that time failed to set an objective standard "with which to measure concentrations of odors in the ambient air." The next year, the Legislature addressed the regulation's deficiency by amending Miss. Code Ann. Section 49-17-19 (Rev. 2002) to read, "[i]n establishing ambient air quality standards for odor, the commission shall adopt recognized objective standards if they exist. In the absence of a recognized objective ambient air quality standard for odor, the commission may adopt such subjective standards as may be appropriate."

¶15. Based on the amended statute, the Commission adopted the current version of APC-S-4, which provides:

> There shall be no odorous substances in the ambient air in concentrations sufficient to adversely and unreasonably:
>
> > (1)    affect human health and well-being;
> > (2)    interfere with the use of enjoyment of property; or
> > (3)    affect plant or animal life.
>
> In determining that concentrations of such substances in the ambient air are adversely and unreasonably affecting human well-being or the use or enjoyment of property of plant or animal life, the factors to be considered by the Commission will include, without limiting the generality of the foregoing, the number of complaints or petitioners alleging that such a condition exists, the frequency of the occurrence of such substances in the ambient air as confirmed by the Department of Environmental quality staff, and the land use of the affected area.

Through this amendment, the Commission provided the necessary objective standards by adding three reasonably measurable parameters.

¶16.    According to Kennard, the Permit Board improperly focused on the second factor, "the frequency of the occurrence of such substances in the ambient air as confirmed by the Department of Environmental quality staff," and since MDEQ staff could not confirm the existence of off-site odors, the Permit Board obviously failed to consider the other factors when issuing a permit with such lax restrictions.   Kennard points to passages in the Permit Board's findings allegedly bearing out this erroneous interpretation, such as the following:

> The factors required to be considered by the Commission limit the applicability of the section in recognition that APC-S-4 is a subjective standard, the application of which by the Commission or Permit Board must rely in chief on the expertise of the agency and the evidence gathered by its staff.   Thus, the Commission built into the regulation the requirement that violations of the standard be judged not only by the land use of the area and the number of complaints received from the public, but also by the number of times that MDEQ staff can confirm these occurrences.   That part of the standard will almost always work to limit the Commission's and the Permit Board's involvement with odor issues to those cases where MDEQ staff can verify the nature, frequency, and severity of the complaints.

¶17.    Generally, this Court accords great deference to an agency's interpretation of its own rules and regulations. *Molden v. Miss. State Dep't of Health*, 730 So. 2d 29, 32-33 (Miss. 1998).    However, where an administrative agency's interpretation is contrary to the unambiguous terms or best reading of a statutory provision, the agency is not entitled to deference. *Miss. Gaming Comm'n v. Imperial Palace of Miss., Inc.*, 751 So. 2d 1025, 1029 (Miss. 1999).   In this case, we find no error in the Permit Board's construction and application of the pertinent regulations.

¶18. Kennard's claim that the Permit Board ignored the complaints made by neighbors of the CAFO is not supported by the record. The Permit Board detailed several of the neighbors' complaints in its findings, and it ultimately affirmed the imposition of multiple air quality control requirements. In fact, the Permit Board noted that "[i]t is chiefly in response to the complaints of offsite odors registered by the Kennard family and other Cook neighbors that MDEQ suggested several odor control features be included in the Cook facility multimedia permit . . . ." Kennard's dissatisfaction with the extent of air quality control measures ordered by the Permit Board does not indicate the Permit Board disregarded complaints by neighbors or suggest the Permit Board elevated MDEQ staff findings to a level of unwarranted importance.

¶19. APC-S-4 requires the Permit Board to examine three relatively objective factors in arriving at its permitting decisions, and the regulation also allows for additional considerations. The Permit Board had before it credible, albeit conflicting, evidence, and we are unable to say it did not consider all of this evidence in arriving at its decision. The record does not indicate the Permit Board's interpretation and application of APC-S-4 was contrary to the plain language of the regulation. As such, its interpretation is entitled to the requisite deference by this Court. *See **Miss. State Tax Comm'n v. Mask***, 667 So. 2d 1313, 1314 (Miss. 1995).[2]

*Economic burden of air quality control measures*

¶20. Kennard also argues the Permit Board unreasonably interpreted various regulations to find it "[could not] include terms that impose a large economic burden in the permit." Not only

---

[2] Kennard's position that the Permit Board's decision is no more than a litigating position, and thus not entitled to deference, is equally unpersuasive. The Permit Board considered the necessary factors under APC-S-4 and arrived at a decision supported by substantial evidence.

9

does Kennard overstate the conclusion of the Permit Board with respect to the role of economically burdensome control measures, Kennard cannot show that the Permit Board's interpretation of the regulatory scheme was in any way erroneous or unreasonable.

¶21.  The Mississippi Administrative Procedures Act requires that prior to the adoption of a rule or significant amendment, each agency proposing such rule must consider the "economic impact the rule will have on the citizens of our state and the benefits the rule will cause to accrue to those citizens."  Miss. Code Ann. Section 25-43-3.105 (Rev. 2002).  Moreover, Miss. Code Ann. Section 49-17-34(2) (Rev. 2002) specifically mandates that

> [a]ll rules, regulations and standards relating to air quality, water quality or air emissions or water discharge standards promulgated by the commission after April 16, 1993 shall be consistent with and shall not exceed the requirement of federal statutes and federal regulations, standards, criteria and guidance relating to air quality, water quality, or air emission or water discharge standards.[3]

¶22.  Finally, the Legislature has given the following unambiguous instructions regarding the adoption of environmental regulations:

> It is the intent of the Legislature to provide protection for the public health and safety and the environment for the citizens of Mississippi.  In providing for such protection, the Legislature recognizes that environmental rules and regulations should have an identifiable scientific basis and should be adopted after consideration of the costs to the regulated community of implementing the rule or regulation.

Act of July 1, 1994, ch. 598 § 2(1), 1994 Miss. Laws (codified as amended at Miss. Code Ann. § 49-2-11 (Rev. 2002)).

¶23.  Given this legislative framework, the Permit Board properly read APC-S-4 to require cost effective measures, if possible, to achieve the stated goal of the regulation.  Additionally,

---

[3] Significantly, there are no federal air quality standards.

nowhere in the Permit Board's findings does the agency state that costly control measures will never be ordered. It simply found that in this case, current violations of APC-S-4 did not exist to a degree that would justify the imposition of conditions in Cook's permit that would place a potentially insurmountable economic burden on the facility. Crediting the evidence presented by MDEQ staff and the expert testimony of Dr. Mike Williams, the Permit Board found the installation of a windbreak wall was a reasonable means of meeting state air quality standards, and the more elaborate measures advocated by Kennard's expert, Dr. Ronald Miner, were unnecessary.

¶24. Despite Kennard's protestations to the contrary, the Permit Board obviously determined the requirements it placed in Cook's air quality permit would result in the facility's compliance with state air quality standards. Its interpretation of APC-S-4 was neither unreasonable nor contrary to the plain language of the regulation. Therefore, this Court defers to the Permit Board's interpretation.

**II. Whether the Permit Board provided sufficient findings of fact and conclusions of law with respect to the technical and expert evidence presented to it.**

¶25. Kennard next argues the Permit Board ignored "voluminous technical evidence and expert testimony submitted with respect to the odor and human health impacts of industrial hog farms," resulting in findings of fact and conclusions of law insufficient for appellate review. Thus, Kennard asks this Court to reverse the Permit Board's decision and remand the matter so proper findings can be made.

¶26. We have held that an agency must clearly explain its factfinding and reasoning for a decision in order to facilitate review by the courts. *McGowan v. Miss. State Oil & Gas Bd.*,

604 So. 2d 312, 324 (Miss. 1992). Conclusory remarks alone do not equip a court to review the agency's findings. *Miss. Sierra Club, Inc. v. Miss. Dep't of Envtl. Quality*, 819 So. 2d 515, 524 (Miss. 2002). Accordingly, findings on factual issues must be specific enough for the reviewing court to determine whether the decision is supported by substantial evidence. *Id.* at 523.

¶27. In this case, the Permit Board was presented with conflicting yet credible testimony from expert witnesses, lay witnesses, and MDEQ staff. The Permit Board drafted twenty-five pages of findings and conclusions which referenced key portions of the evidence offered by Kennard. While the findings may not have referred to each piece of technical evidence before the Permit Board, this Court does not require administrative agencies to exhaustively discuss in their findings every bit of evidence presented for their consideration. Rather, the agency's findings must be specific enough to allow this Court to evaluate whether the decision is supported by substantial evidence.

¶28. The Permit Board has provided such findings, including a discussion of the testimony by Dr. Miner, Kennard's expert who recommended more restrictive control measures, and an explanation of the technical evidence and testimony refuting Dr. Miner's conclusions. The findings reveal the Permit Board rejected Dr. Miner's "worst-case view" based on testimony and technical evidence presented by Dr. Williams; Dwight Wylie, Chief of MDEQ's Air Division; Jerry Cain, Chief of MDEQ's Environmental Permits Division; and the *Iowa Concentrated Animal Feeding Operations Air Quality Study, Final Report* (Iowa State University and The University of Iowa Study Group, February 2002).

¶29. Essentially, the crux of Kennard's complaint with the Permit Board's findings is that the agency did not give the desired discussion of or credence to his evidence and expert. However, that dissatisfaction does not equate with insufficient findings. The Permit Board included ample discussion of the reasoning for its findings, allowing for proper appellate review. The Permit Board found that odor problems existed at Cook's facility, although perhaps not to the extent argued by Kennard, and it took positive steps to address those problems with the inclusion in Cook's permit of an air pollution chapter requiring several control measures, including a windbreak wall. Finally, it fully explained its decision not to include further measures suggested by Kennard's expert, Dr. Miner.[4]

¶30. The Permit Board provided sufficient findings of fact and conclusions of law with respect to the technical and expert evidence presented to it. The decision to affirm the air permit as previously issued was supported by substantial evidence, was neither arbitrary nor capricious, was within the Permit Board's power, and was not violative of any party's rights. As such, this Court affirms the Permit Board's decision.

### III. Whether the Permit Board's decision not to require a monitoring regime for Cook's facility was arbitrary and capricious.

¶31. Kennard finally argues the Permit Board's failure to require a program to monitor odor as a term in Cook's permit was arbitrary, capricious, and contrary to law. We find no legal merit to this argument. As a separate issue, the Permit Board directed MDEQ staff "to develop a monitoring program around the Cook facility to try to determine with some degree of

---

[4] Kennard's charge that the Permit Board's decision was merely a way to avoid making a difficult and politically volatile decision is completely unsupported by either the facts or the law, and it does not warrant discussion by this Court.

accuracy the strength and frequency of occurrence of offsite odor," and to report back with its findings. Then, should the collection of additional data so require, the permit could be reopened and amended based on the new information. As previously noted, the Permit Board believed that Cook's facility emitted some amount of objectionable odor, but its extent was difficult to quantify. The Permit Board's decision to further study the situation and possibly revise the permit based on the results of that study cannot be considered arbitrary or capricious.

## CONCLUSION

¶32. Faced with conflicting yet credible testimony, the Permit Board made the following observation:

> Put bluntly, if the Permit Board accepts only the testimony of Kennard's witnesses, then the permit recommendations of MDEQ are not sufficient. But if the Permit Board accepts only the testimony of Cook's witnesses, then the Permit Board has no justification for requiring the additional odor and emission control elements of the multimedia permit. The Permit Board finds that the objective truth, if such a state exists with odor, is somewhere in the middle.

After evaluating the evidence presented by both sides, the Permit Board arrived at a decision imposing several air quality control requirements on Cook's facility. We agree with the chancellor that the Permit Board's decision was supported by substantial evidence and may not be disturbed on appeal.

¶33. Kennard's attack on the Board's decision is very different from a claim of nuisance or some other civil wrong which requires a showing of wrongful conduct directed at him. In his appeal of the decision of the Permit Board, the sole question is whether the Permit Board's decision to issue the permit was supported by substantial evidence in the record and within the

body's legislative grant of authority. It was, and therefore we affirm both the judgment of the chancellor and the decision of the Permit Board.

¶34. **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., DIAZ, EASLEY, CARLSON, GRAVES AND RANDOLPH, JJ., CONCUR. COBB, P.J., NOT PARTICIPATING.**

**APPENDIX**

a. The air requirements chapter requires the following best management practices:

1. Operators of the facility shall practice odor control methods during the course of manure removal and field application. Odor control methods shall be those methods identified in the Comprehensive Nutrient Management Plan (CNMP) created for the facility. Odor reduction and control shall be obtained through chemical, biological, or mechanical means where deemed appropriate.

2. Operators shall consider wind direction and other relevant conditions before spray application occurs.

3. Low pressure systems shall be used and spray head orientation such to minimize aerosol drift and stripping of volatile compounds.

4. Influent pipes shall not be designed such that a free fall of wastes occurs from the influent pipe to the lagoon or from the houses to the lagoon surface. Influent pipes shall be designed for below-water discharge into the lagoons.

5. Dead animals shall be stored in closed containers. These "dead boxes" shall be completely closed and sealed at all times except when depositing carcasses. Containers with damaged lids are prohibited. The Pollution Prevention Plan shall include an approvable method of treatment and/or disposal of contaminated soils around the dead animal handling and storage areas.

6. Facilities shall not expand operations, either in size or number of animals, prior to amending or enlarging the waste handling procedures and structures to accommodate any additional wastes that will be generated by the expanded operations. The facility shall not be expanded without Permit Board approval.

7. Waste handling, treatment, and management shall not result in the destruction or adverse modification of the critical habitat of endangered or threatened species, or contribute to the taking of endangered or threatened species of plant, fish, or wildlife.

8. Solids, sludges, manure, or other pollutants removed in the course of treatment or control of wastewaters shall be disposed of in a manner such as to prevent significant degradation of ambient air quality.

9.   Dead animals shall be properly disposed of off-site within three (3) days unless otherwise provided for by the State Board of Animal Health. Animals shall be disposed of in a manner to prevent significant degradation of ambient air quality. Incinerators require additional permit coverage from the Department and are not allowed by the issuance of this permit.

10.  Collection, storage, and disposal of liquid and solid waste should be managed in accordance with recognized practices of good agricultural management. The economic benefits derived from agricultural operations carried out at the land disposal site shall be secondary to the proper disposal of waste.

b.   The air requirements chapter requires the permittee to submit a study plan to the Permit Board to determine the optimum barn flushing frequency in order to minimize odors associated with barn flushing by April 12, 2002 and begin implementation of the study plan by April 26, 2002.

c.   The air requirement chapter requires the permittee to construct a dust control barrier (commonly known as an air dam or windbreak wall, or the equivalent) at a suitable distance behind the exhaust fans of each housing unit. The barrier shall extend from the ground to a height exceeding the tallest exhaust fan mounted in the housing unit and shall be as wide as the housing unit. Alternatively, mechanical dust collection devices may be installed on the individual exhaust fans.

d.   The multimedia permit includes the broad reopener provision, as follows:

This permit shall also be modified, or alternatively, revoked and reissued, for the inclusion of new Best Management Practices (BMPs) and technology requirements if the BMPs and technology requirements so approved:

(a)   Contain different conditions or are otherwise more stringent than any BMP or technology requirement in the permit; or control any pollutant not limited in the permit.

(b)   The Air Pollution Control Requirements established in this permit are subject to revision if and when more stringent regulatory requirements become applicable.